IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
SALISBURY DIVISION

| | |
|---|---|
| CRAIG CUNNINGHAM<br><br>Plaintiff,<br>v.<br>WALLACE & GRAHAM, P.A., MONA LISA WALLACE, BILL GRAHAM, WHITNEY WALLACE WILLIAMS, MARK P. DOBY, RHINE LAW FIRM, P.C., JOEL R. RHINE, SOKOLOVE LAW, LLC, AND RICKY A. LEBLANC<br>Defendants. | Case No.<br><br>**JURY TRIAL DEMANDED** |

## PLAINTIFF'S COMPLAINT

Plaintiff Craig Cunningham ("Cpt. Cunningham"), by his undersigned counsel, for this complaint against Defendants Wallace & Graham, P.A., Mona Lisa Wallace, Bill Graham, Whitney Wallace Williams, Mark P. Doby, Rhine Law Firm, P.C., Joel R. Rhine, Sokolove Law, LLC, and Ricky A. Leblanc, as well as their present, former and future direct and indirect parent companies, subsidiaries, affiliates, agents and related entities, alleges as follows:

### I. INTRODUCTION

1. <u>Nature of Action</u>: As the Supreme Court has explained, "Americans passionately disagree about many things. But they are largely united in their disdain for robocalls. The Federal Government receives a staggering number of complaints about robocalls—3.7 million complaints in 2019 alone. The States likewise field a constant barrage of complaints. For nearly 30 years, the people's representatives in Congress have been fighting back. As relevant here, the Telephone Consumer Protection Act of 1991, known as the TCPA, generally prohibits robocalls to cell phones and home phones." *Barr v. Am. Ass'n of Political Consultants*, 140 S. Ct. 2335, 2343 (2020).

2. "Telemarketing calls are intrusive. A great many people object to these calls, which interfere with their lives, tie up their phone lines, and cause confusion and disruption on phone records. Faced with growing public criticism of abusive telephone marketing practices, Congress enacted the Telephone Consumer Protection Act of 1991. Pub. L. No. 102-243, 105 Stat. 2394 (1991) (codified at 47 U.S.C. § 227). As Congress explained, the law was a response to Americans 'outraged over the proliferation of intrusive, nuisance calls to their homes from telemarketers,' *id.* § 2(6), and sought to strike a balance between '[i]ndividuals' privacy rights, public safety interests, and commercial freedoms,' *id.* § 2(9)." *Krakauer v. Dish Network, L.L.C.*, 925 F.3d 643, 649 (4th Cir. 2019).

3. Plaintiff brings this action against Defendants for violations of the Telephone Consumer Protection Act, 47 U.S.C. § 227 ("TCPA") for making automated telemarketing calls to cellular telephone numbers, including his own, refusing to abide by multiple statutory code provisions promulgated under the TCPA, together with violations of North Carolina Law.

## II. PARTIES

4. Plaintiff Cunningham is an individual who resides in the Western District of Texas.

5. Defendant Wallace & Graham, P.A. is a Salisbury, North Carolina based law firm that practices nationally in the field of, among other things, Camp Lejeune Mass Tort Litigation. It is headquartered in Salisbury, North Carolina, but attempts to solicit individuals from across the country, including North Carolina and Texas, for said litigation.

6. Defendants Mona Lisa Wallace, Bill Graham, Whitney Wallace Williams, Mark P. Doby are residents of North Carolina which signed the proposed retainer agreement for Defendant Wallace & Graham, P.A., which was sent to the Plaintiff as a result of the illegal telemarketing calls complained of herein.

2

7. Defendant Rhine Law Firm, P.C., is a Wilmington, North Carolina based law firm that practices nationally in the field of, among other things, Camp Lejeune Mass Tort Litigation. It is headquartered in Wilmington, North Carolina, but attempts to solicit individuals from across the country, including North Carolina and Texas, for said litigation.

8. Defendant Joel R. Rhine is a resident of North Carolina which signed the proposed retainer agreement for Defendant Rhine Law Firm, P.C., which was sent to the Plaintiff as a result of the illegal telemarketing calls complained of herein.

9. Defendant Sokolove Law LLC is a Delaware based law firm that practices nationally in the field of, among other things, Camp Lejeune Mass Tort Litigation. It has offices in multiple stats, including Wilmington, NC, and attempts to solicit individuals from across the country, including North Carolina and Texas, for said litigation.

10. Defendant Ricky A. LeBlanc is a resident of Massachusetts which signed multiple emails sent as a result of the illegal telemarketing calls attempting to have Plaintiff retain Defendant Sokolove Law LLC.

### III. JURISDICTION AND VENUE

11. <u>Jurisdiction.</u> This Court has federal-question subject matter jurisdiction over Plaintiff's TCPA claims pursuant to 28 U.S.C. § 1331 because the TCPA is a federal statute. 47 U.S.C. § 227; *Mims v. Arrow Fin. Servs., LLC*, 565 U.S. 368, 372 (2012). This Court also has supplemental jurisdiction over the Plaintiff's state law telemarketing claims because such claims relate to the same telemarketing campaign that also violated the TCPA.

12. <u>Venue</u>: Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to Plaintiff's claims—namely, the illegal telemarketing at issue—were orchestrated from this District and was for potential litigation to be filed by law firms located in this District.

## IV. FACTS

### A. Calls Made Using an ATDS

13. The TCPA regulates, among other things, the use of an Automatic Telephone Dialing System (ATDS) to make calls. *See* 47 U.S.C. § 227, *et seq.*; *In re Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991, Report and Order*, 18 FCC Rcd. 14014, 14115 ¶ 165 (2003).

14. Specifically, the TCPA prohibits the use of an ATDS to send calls to a wireless number in the absence of an emergency or the prior express written consent of the called party. *See* 47 U.S.C. § 227(b)(1)(A)(iii); 47 C.F.R. § 64.1200(a)(2); *In the Matter of Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 27 F.C.C. Rcd. 1830, 1831 (F.C.C. 2012).

15. "[P]rior express written consent means an agreement, in writing, bearing the signature of the person called that clearly authorizes the seller to deliver or cause to be delivered to the person called advertisements or telemarketing messages using an automatic telephone dialing system or an artificial or prerecorded voice, and the telephone number to which the signatory authorizes such advertisements or telemarketing messages to be delivered." 47 C.F.R. § 64.1200(f)(8).

### B. The TCPA's Implementing Regulations

16. The TCPA regulates, among other things, restrictions regarding the sending of telemarketing calls in 47 CFR § 64.1200. Specifically, a violation of one of the statutory prohibitions codified in 47 CFR § 64.1200 constitutes a violation of 47 U.S.C. § 227(c), which is subject to an award of $500 per violation plus treble damages, per 47 U.S.C. § 227(c)(5)(B).

17. Specifically, the TCPA's implementing regulations prohibit a wide array of misleading, deceptive, and unlawful conduct in the connection of sending illegal telemarketing

4

calls. Of relevance here, 47 CFR § 64.1200(d) requires any entity making calls for telemarketing purposes to have a written policy for maintaining a do-not-call list (d)(1), train its personnel (d)(2), maintain and record internal do-not-call requests (d)(3), and identify themselves by individual name, who they are calling on behalf of, and provide a telephone number and mailing address for the caller (d)(4).

C. **North Carolina's Telephone Solicitations Act**

18. Recognizing the particular harm that illegal telemarketing does to both residents of North Carolina and recognizing the particular harm that North Carolina-based bad actors have on the reputation of North Carolina as a state and against the public interest, the North Carolina General Assembly passed the North Carolina Telephone Solicitations Act in 2003 and codified it at N.C. GEN STAT. § 75-100.

19. Damages under the NCTSA are set by statute at $500 for the first violation, $1,000 for the second violation, and $5,000 for the third and subsequent violation, in addition to injunctive relief and attorney's fees and costs. N.C. GEN STAT. § 75-105.

20. Of relevance here, the NCTSA requires a telephone solicitor to clearly identify both themselves and the company at the beginning of the call. N.C. GEN STAT. § 75-102(c)(1). It also requires that such solicitors implement systems to apply customers who have asked not to be called on an internal do not call list and to honor such requests. (b), (d). It also prohibits telephone solicitors from violating any of the deceptive, abusive, or recordkeeping requirements of the Telemarketing Sales Rule. (e). It also requires telephone solicitors to inquire as to if the subscriber is under the age of 18, prohibits the transmission of misleading information as to the origin of calls, and imposes recordkeeping requirements. (g), (i), (j).

### D. Unsolicited Telemarketing to Plaintiff

21. Plaintiff Cunningham is, and at all times mentioned herein was, a "person" as defined by 47 U.S.C. § 153(39).

22. Defendants are and at all times mentioned herein were "persons" as defined by 47 U.S.C. § 153(39).

23. At no point did the Plaintiff consent to receiving telemarketing calls from the Defendants prior to receiving the automated calls at issue.

24. Plaintiff's residential cellular telephone number is (615)-XXX-XXXX.

25. Mr. Cunningham uses the number for personal, residential, and household reasons.

26. The number is assigned to a residential telephone exchange service for consumers.

27. The number is serviced by a wireless telephone company.

28. That telephone number is not associated with a business.

29. Plaintiff Cunningham never consented to receive calls from Defendants.

30. Plaintiff Cunningham never did business with the Defendants.

31. In September of 2023, the Department of Justice announced that it would pay out Camp Lejeune claimants between $100,000 and $550,000 with minimal scrutiny and without them needing to file a lawsuit, as Defendant LeBlanc stated on his website. Ricky A. LeBlanc, *Voluntary Elective Options Announced*, SOKOLOVE LAW (Sept. 6, 2023), https://www.sokolovelaw.com/personal-injury/camp-lejeune-water-contamination/lawsuit-updates/

6

32. The promise of potentially easy, quick money and lucrative payouts led Mr. LeBlanc to mastermind an illegal telemarketing scheme to mass dial numbers throughout the United States the following month to generate as many Camp Lejeune claimants as possible with minimal scrutiny.

33. In total, between October 2, 2023, and November 28, 2023, the Plaintiff received 43 calls and 4 text messages sent by the Defendants. Twelve of those calls came from agents who directly identified themselves as calling from Defendant Sokolove Law and which numbers, when called back, transfer to agents of Defendant Sokolove Law.

34. The calls were all sent over the wireless telephone network.

35. The calls were all "telemarketing" because they sought to encourage and solicit the Plaintiff to purchase and invest in the Defendants' legal services.

36. Despite this, on October 2, 2023 at 11:12 AM, the Plaintiff received an unsolicited telephone call on the aforementioned number from the caller ID 786-758-3380.

37. When Plaintiff answered, there was a long delay, followed by a pause and a computerized noise made by an Asterisk-based phone system which plays to indicate that the call was connected to a human being when there was no human being previously, and is most particularly evident when a call is placed using Asterisk's "rand" function.

38. Asterisk comes programmed as standard to be able to randomize and/or sequentially generate telephone numbers using a build-in command called "rand."

39. The fact that the Plaintiff was called, despite him never having been to Camp Lejeune or even serving in the US Marine Corps or Navy, lends credence to the fact that Plaintiff's telephone number was also randomized and randomly or sequentially generated and these calls were just being spammed out blanketing the entire United States.

7

40. Furthermore, Plaintiff provided notice to the world and anyone with an ECF account or internet access that he did not want to receive illegal calls regarding Camp Lejune calls because he is already suing Watts Guerra and several other law firms in the Western District of Texas for placing unsolicited Robocalls to his cell phone for identical conduct, which such lawsuits have been covered in multiple nationwide news publications, including Reuters.

41. Plaintiff spoke to an agent of the Defendants, upon information and belief, an agent of Sokolove Law named "Sean Martin," who was calling to see if the Plaintiff was interested in making a Camp Lejune claim.

42. This agent of Sokolove Law promised the Plaintiff "hundreds of thousands of dollars at your doorstep," guaranteed a minimum payout of $150,000, and stated that "everything would be taken care of from [Sokolove's] side."

43. Although the Plaintiff is a highly-decorated military officer and veteran who stood toe-to-toe with the North Koreans at Panmunjom, Plaintiff served in the United States Army and attended the United States Military Academy at West Point, New York and never was stationed at Camp Lejeune or served in the Marines. Furthermore, Plaintiff was a 4-year letterman in football and played in 4 Army-Navy games where there is a *slight* rivalry with the Navy, and by extension Marines, to put it mildly.

44. The agent stated that the Plaintiff need not worry and that the Plaintiff would be sent an email to coach him through the process.

45. Indeed, shortly after this call took place, the Plaintiff received a detailed email from Sean Martin, the agent with whom the Plaintiff spoke, full of bogus information that Defendants wanted the Plaintiff to submit to the federal government as part of a fraudulent and fictitious Camp Lejeune injury claim.

46. The calls continued, including a call on October 2 at 12:00 PM from 786-758-3380 during which the caller heavily coached the Plaintiff on what to tell the managing attorney during an anticipated interview, provided him specific dates, and did role playing. The caller encouraged the Plaintiff to "be confident" as a euphemism for lying, and said that if he was confident in the script and signed the paperwork, he would get $150,000 within 2-3 months.

47. Then, the Plaintiff got calls from 310-579-4443 about an hour later. This call was with a paralegal at Sokolove Law calling to verify the exact same information "Sean Martin" said Plaintiff would have to provide.

48. The calls nevertheless continued. At 1:27 PM, the Plaintiff got a call from 786-758-3380 and the caller stated that the Plaintiff had "mistakes" on the call, chastised the Plaintiff for not lying to the paralegal well enough and getting mixed up on the pre-arranged script well enough. Plaintiff was then coached through and rehearsed the bogus script again that was presented by "Sean Martin," and stated that another paralegal would call the Plaintiff back.

49. The Plaintiff got calls like clockwork at 1:29 PM and 1:36 PM just minutes later from 301-579-4443 from a paralegal at Sokolove Law who wanted to ensure that the Plaintiff did not "mess up" and stated that the Plaintiff's file would be forwarded to Sokolove's "expert attorneys."

50. Thereafter, at 2:00 PM, a number of things happened. Plaintiff got a call from 866-444-9876, a number used by Sokolove Law directly and when called rings back to Sokolove Law. During this call, the individual with whom Plaintiff spoke, whom Plaintiff believes was a paralegal in Defendant LeBlanc's office, stated that Sokolove was "partnering with" Defendant Wallace & Graham on the case, and wanted the Plaintiff's permission to share information with

9

Wallace & Graham. This individual stated that they would send the Plaintiff a contingency agreement.

51. At 2:09 PM, the Plaintiff received a confirmation email from the Sokolove Law Case Management Team as well as a contingency agreement sent through a digital document signing service called Conga Sign.

52. The proposed contingency agreement Plaintiff received as a result of the illegal telemarketing calls was sent from Sokolove Law, and provided that Wallace & Graham would get 72% of a 33.33% contingent recovery, provided that Sokolove Law would get 20%, and that Rhine Law Firm would get 8%. The agreement was already signed by Defendants Wallace, Graham, Williams, and Doby for Wallace & Graham and signed by Defendant Rhine for Rhine Law Firm. It must also be noted that a 33.33% contingent fee is unlawful in a Federal Tort Claims Act case and exceeds the amount permitted by 28 U.S.C. § 2678:

WALLACE & GRAHAM, PA

By: *Mona Lisa Wallace*
Mona Lisa Wallace, Esq.
Bill Graham, Esq.
Whitney Wallace Williams, Esq.
Mark P. Doby, Esq.

RHINE LAW FIRM, P.C.

By: *[signature]*
Joel R. Rhine, Esq.

53. Thereafter, the Plaintiff received a call on October 2, 2023 at 4:18 PM from the caller ID 301-579-4443 to confirm that he received the aforementioned unlawful agreement and pressuring him to sign it immediately.

54. Thereafter, the Plaintiff received twenty-four additional incoming calls from October 3, 2023 to November 28, 2023 from the caller ID 786-758-3380 all in an attempt to get the Plaintiff to sign the unlawful retainer.

55. Plaintiff also received multiple emails hurriedly pressuring him to sign the unlawful retainer from Sokolove Law. These emails were for the most part signed and sent by Defendant LeBlanc

56. What's more, the Plaintiff received a text message from that number on October 18, pressuring him to sign the unlawful retainer:



57. The Plaintiff also received 10 calls and three text messages from the caller ID 855-642-4133, which is associated with Sokolove Law directly, pressuring him to sign the unlawful retainer.

58. In none of the calls or text messages were the agents calling identified by their full names at the outset of the calls.

59. In none of the calls or text messages was the company name, let alone callback number or name and address, disclosed at the outset of the calls.

60. In an effort to resolve the matter and to ascertain the nature of the calls and why he was receiving them, Plaintiff spoke with Defendant Mona Lisa Wallace on two separate occasions.

61. During the calls, Defendant Mona Lisa Wallace denied knowing anything about or having any records for the illegal telemarketing alleged and stated, "We do everything in house here. . . . We've got a big firm and we don't need it." "Our firm does not do robocalls. . . . I've never associated with any law firm that does."

62. However, Defendant Mona Lisa Wallace had no problem of boasting about being on the steering committee for Camp Lejeune litigation or that she was responsible for "suing the crap out of" and obtaining $500 million from the U.S. government, which she apparently has records for, but supposedly has no records for how such clients were obtained.

63. Based on this fact, it is evident that the Defendants did not keep any records of the illegal calls the Plaintiff received, let alone for the requisite 24 months, in blatant violation of North Carolina law.

64. When asked how Mona Lisa Wallace was getting Camp Lejeune leads, she responded, "Well, that's none of your business."

65. Based on this fact, together with the knowingly false statements made by the agents with whom Plaintiff spoke, including by asking him to provide manufactured information to the federal government in connection with a Camp Lejeune claim, and sending the Plaintiff a proposed retainer agreement seeking excessive fees in violation of federal law, it is evident both that the Defendants are engaging in deceptive acts and practices under the Telemarketing Sales Rule as well as not properly training its personnel in legal calling techniques and legal client acquisition.

66. During a call with Mona Lisa Wallace and Joel Rhine, the Plaintiff asked for Defendants' do not call policy and to be placed on the Defendants' do not call list.

67. The aforementioned Defendants denied the aforementioned requests stating, "We have confidentiality agreements. . . . We're not giving you any information."

68. Demonstrating control over the callers, Defendant Rhine went on to say, "I received a phone call too, and I stayed on it. . . . And as soon as I identified myself [to them], they stopped it."

69. Defendants Wallace and Rhine stated with righteous indignation that they would get the authorities involved and that they would reach out to the Plaintiff, but nobody did.

70. Based on the foregoing, the Plaintiff alleges both that the Defendants did not implement a system to apply to customers who have asked not to be called nor honor such requests. And because they do not do so, it follows that they have no policies or procedures for doing so.

71. Under the TCPA, an individual such as the individual Defendants may be personally liable for the acts alleged in this Complaint pursuant to 47 U.S.C. § 217 of the TCPA, which reads, *inter alia*: "[T]he act, omission, or failure of any officer, agent, or other person

acting for or employed by any common carrier or user, acting within the scope of his employment, shall in every case be also deemed to be the act, omission, or failure of such carrier or user *as well as of that person.*" 47 U.S.C. § 217 (emphasis added).

72. The individual Defendants personally participated in the actions complained of by: (a) personally signing proposed retainer agreements sent as a result of the illegal calls; (b) personally making contact with the Plaintiff in an effort to attempt to get the Plaintiff to sign the retainer agreement; (c) personally overseeing the corporate Defendants' marketing efforts, which included the use of telemarketing, new client marketing, and intake; (d) personally generating business from and personally supporting the telemarketing calls complained of herein; (f) personally refusing to take responsibility and provide the Plaintiff a copy of their do not call policies and place the Plaintiff on their do not call lists as required by law; and (g) taking responsibility for TCPA compliance and fielding TCPA-related complaints but then failing to take any action when presented with a complaint regarding the same.

73. At least the 786-758-3380 telephone number is associated with a telephone provider named VoIP Innovations, a "wholesale carrier services" telephone service offered by a company named Sangoma.

74. Sangoma markets VoIP Innovations as a turnkey wholesale carrier service to use with its telephone system, named Asterisk.

75. As described above, Asterisk has the out-of-the box functionality to generate random telephone numbers using the "rand" function. The following code is an example of code which is used to make telephone calls to random telephone numbers in the "615" area code, like Plaintiff's, using the "rand" function:

```
same => n,Set(num=${RAND(6152000000,6159999999)})
same => n,Dial(SIP/${num})
```

14

76. Without the benefit of discovery and expert analysis, it is impossible to state with certainty how the dialer used by the Defendants operates or the exact code used to randomly generate telephone numbers, together with any ancillary code used, such as to limit the rate at which numbers are dialed. But, given that at least one of the numbers uses Asterisk and Asterisk has a "rand" function, together with other indicia on the call, it is evident and therefore alleged that the system used to contact the Plaintiff operates in this or substantially similar manner.

77. The calls were unwanted.

78. The calls were nonconsensual encounters.

79. During none of the calls was the Plaintiff asked if he was over 18.

80. Plaintiff's privacy has been repeatedly violated by the above-described telemarketing calls.

81. Plaintiff never provided his consent or requested the calls.

82. Plaintiff has been harmed by the acts of Defendants because his privacy has been violated and he were annoyed and harassed. In addition, the calls occupied his telephone lines, storage space, and bandwidth, rendering them unavailable for legitimate communication, including while driving, working, and performing other critical tasks.

**FIRST CAUSE OF ACTION**
**Violation of the TCPA's Prohibition Against Automated Calling**
**With an Automatic Telephone Dialing System (ATDS)**

83. Plaintiff incorporates the allegations from all previous paragraphs as if fully set forth herein.

84. The foregoing acts and omissions of Defendants and/or their affiliates, agents, and/or other persons or entities acting on Defendants' behalf constitute numerous and multiple

violations of the TCPA, 47 U.S.C. § 227, by making calls and sending messages, except for emergency purposes, to the telephone number of Plaintiff using an ATDS.

85. As a result of Defendants' and/or their affiliates, agents, and/or other persons or entities acting on Defendants' behalf's violations of the TCPA, 47 U.S.C. § 227, Plaintiff is entitled to an award of $500 in damages for each and every call made to his telephone number for which he is charged for the call using an ATDS in violation of the statute, pursuant to 47 U.S.C. § 227(b)(3)(B).

86. Plaintiff is also entitled to and does seek injunctive relief prohibiting Defendants and/or their affiliates, agents, and/or other persons or entities acting on Defendants' behalf from violating the TCPA, 47 U.S.C. § 227, by making calls or sending messages, except for emergency purposes, to any number using an artificial or prerecorded voice in the future.

87. The Defendants' violations were wilful and/or knowing.

## SECOND CAUSE OF ACTION
### Violation of the TCPA's Implementing Regulations
### Codified in 47 C.F.R. § 64.1200(d)

88. Plaintiff incorporates the allegations from all previous paragraphs as if fully set forth herein.

89. By placing at least 47 telemarketing calls/messages to the Plaintiff, while failing to have a written Do-Not-Call policy, and failing to maintain the Plaintiff on their Do-Not-Call list, failing to train its personnel, and fail to identify themselves, Defendants, jointly and severally, violated 47 U.S.C. § 227(c)(5) by violating the implementing regulations codified in 47 C.F.R. § 64.1200(d)(1), (2), (3), and (4).

90. This amounts to 141 violations since Defendants committed four violations per call. The first violation is by calling Plaintiff without having a Do-Not-Call policy in place. 47

16

C.F.R. § 64.1200(d)(1). The second violation is failing to train its personnel. 47 C.F.R. § 64.1200(d)(2). The third violation is by refusing to record a do-not-call request. 47 C.F.R. § 64.1200(d)(3). The fourth violation is failing to identify themselves by individual name, who they are calling on behalf of, and provide a telephone number and mailing address for the caller. 47 C.F.R. § 64.1200(d)(4).

91. The foregoing acts and omissions of Defendants and/or their affiliates, agents, and/or other persons or entities acting on Defendants' behalf constitute at least 141 violations of the TCPA, 47 U.S.C. § 227(c), codified at 47 C.F.R. § 64.1200, as outlined immediately above.

92. As a result of Defendants' and/or their affiliates, agents, and/or other persons or entities acting on their behalf's violations of the TCPA, 47 U.S.C. § 227(c), Plaintiff is entitled to an award of $500 in damages for each and every call and violation made to his telephone number in violation of the TCPA's implementing regulations codified at 47 C.F.R. § 64.1200, pursuant to 47 U.S.C. § 227(c)(5)(B).

93. Plaintiff is also entitled to and does seek injunctive relief prohibiting Defendants and/or their affiliates, agents, and/or other persons or entities acting on their behalf from violating the TCPA, 47 U.S.C. § 227(c), by making calls or sending messages in violation of any of the TCPA's implementing regulations in the future.

94. The Defendants' violations were knowing and/or willful. Accordingly, the Plaintiff seeks up to treble damages of the $500 per violation award, as provided in 47 U.S.C. § 227(b)(3)(B).

17

Case 1:24-cv-00221-TDS-LPA   Document 1   Filed 03/12/24   Page 17 of 20

## THIRD CAUSE OF ACTION
**Violation of the North Carolina Telephone Solicitations Act**

95. Plaintiff incorporates the allegations from all previous paragraphs as if fully set forth herein.

96. By placing at least 47 telemarketing calls/messages to the Plaintiff, Defendants violated multiple portions of the North Carolina Telephone Solicitations Act as codified in N.C. GEN STAT. § 75-102.

97. Specifically, Defendants committed at least seven violations on each call the Plaintiff received. To wit, Defendants: 1). Called Plaintiff's number after the Plaintiff indicated he did not want to be contacted in violation of N.C. GEN STAT. § 75-102(b); 2). Did not identify themselves at the beginning of each call in violation of N.C. GEN STAT. § 75-102(c)(1); 3). Failed to implement systems to apply to customers who have asked not to be called to be placed on an internal Do Not Call list in violation of N.C. GEN STAT. § 75-102(d); 4). Violated various portions of the deceptive, abusive, and recordkeeping requirements of the Telemarketing Sales Rule in violation of N.C. GEN STAT. § 75-102(e); 5). Did not inquire if the Plaintiff was over 18 in violation of N.C. GEN STAT. § 75-102(g); 6). Transmitted misleading information about the origin of the calls in violation of N.C. GEN STAT. § 75-102(i); and 7). Failed to maintain records of calls for 24 months in violation of N.C. GEN STAT. § 75-102(j).

98. This amounts to 329 violations since Defendants committed seven violations per call, as outlined above.

99. The foregoing acts and omissions of Defendants and/or their affiliates, agents, and/or other persons or entities acting on Defendants' behalf constitute at least 329 violations of the NCTSA, N.C. GEN STAT. § 75-101 *et seq.*, as outlined immediately above.

100. As a result of Defendants' and/or their affiliates, agents, and/or other persons or entities acting on their behalf's violations of the NCTSA, N.C. GEN STAT. § 75-101 *et seq.*, Plaintiff is entitled to and does seek an award of $500 in damages for the first violation, $1,000 for the second violation, and $5,000 for the third and subsequent violation, in addition to injunctive relief and attorneys' fees and costs, pursuant to N.C. GEN STAT. § 75-105(b)(1), (b)(2), and (d).

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for the following relief:

A. Injunctive relief prohibiting Defendants from calling telephone numbers advertising their goods or services, except for emergency purposes, using an ATDS or in violation of any of the TCPA's implementing regulations in the future;

B. An award of $500 in statutory damages for the first violation of the NCTSA, an award of $1,000 for the second violation of the NCTSA, and an award of $5,000 for the third and each subsequent violation of the NCTSA;

C. An award of statutory damages of $500 for each violation of the TCPA and $1,500 for each knowing or willful violation;

D. Injunctive relief as permitted under the NCTSA and TCPA;

E. An award of Plaintiff's reasonable attorneys' fees and costs; and

F. Orders granting such other and further relief as the Court deems necessary, just, and proper.

## V. DEMAND FOR JURY

Plaintiff demands a trial by jury for all issues so triable.

RESPECTFULLY SUBMITTED AND DATED this March 12, 2024.

*/s/ Ryan P. Duffy*
Ryan P. Duffy, Esq.
The Law Office of Ryan P. Duffy PLLC
1213 W. Morehead Street, Suite 500, Unit 450
Charlotte, NC 28208
Phone: 704-741-9399
Fax: 980-218-0855
ryan@ryanpduffy.com

Andrew Roman Perrong, Esq.
Perrong Law LLC
2657 Mount Carmel Avenue
Glenside, Pennsylvania 19038
Phone: 215-225-5529 (CALL-LAW)
Facsimile: 888-329-0305
a@perronglaw.com

*Attorneys for Plaintiff*

20