| | |
|---|---|
| CRAIG CUNNINGHAM,<br><br>　　Plaintiff,<br>v.<br><br>WALLACE & GRAHAM, P.A., MONA LISA WALLACE, BILL GRAHAM, WHITNEY WALLACE WILLIAMS, MARK P. DOBY, RHINE LAW FIRM, P.C., JOEL R. RHINE, SOKOLOVE LAW, LLC, AND RICKY A. LEBLANC<br><br>　　Defendants. | **BRIEF IN OPPOSITION TO DEFENDANTS' PARTIAL MOTION TO DISMISS** |

Comes now the Plaintiff, Craig Cunningham, by and through the undersigned counsel, and hereby files this brief in opposition to the various Defendants' partial motion to dismiss and in support thereof states as follows:

## INTRODUCTION

Owing to the extensive nature of the moving Defendants' briefing, the Plaintiff, a highly-decorated West Point Army veteran, here does not reiterate the complete factual basis for his claims nor the procedural posture of this case. However, Defendants' partial motion to dismiss can be boiled down to three main arguments, which are meritless as follows: Defendant LeBlanc states he should be dismissed because of purported jurisdictional issues, but does not address the allegation that he directed and masterminded the illegal North Carolina telemarketing scheme here to solicit clients for North Carolina lawsuits. The remaining individual defendants and two of the law firms, Wallace & Graham and Rhine Law Firm, PC, claim that they cannot be liable for the illegal conduct alleged, but they completely ignore the fact that they signed and sent the Plaintiff an illegal retainer

-1-

agreement. Finally, all Defendants attempt to dismiss the Plaintiff's state law claims and his federal claims for use of an autodialer, except for one call, but the Defendants misread both state law and do not properly account for the fact that twenty-five calls all came from the same automated system. The motion to dismiss should be denied in its entirety and the matter permitted to proceed to discovery on all claims. Defendants will be free to rehash these arguments for dismissal at jury trial.

## LEGAL STANDARD

The Defendants move to dismiss the Plaintiff's claims, as described above, under Rules 12(b)(2), (5), and (6) of the Federal Rules of Civil Procedure. The standards for dismissal under each standard are well-established before and known to this Court. In ruling on these motions, the court must accept the allegations in the complaint as true and draw all reasonable inferences supported by the well pleaded factual allegations in the plaintiff's favour. However, the 12(b)(2) and 12(b)(5) challenges are unique in that they not limited to the four corners of the pleading and the Court may consider additional evidence proffered by both parties, including affidavits, evidence, and judicially noticeable records. To survive a motion to dismiss under 12(b)(6), a complaint must contain sufficient facts which, if accepted as true, state a claim for relief that is plausible on its face. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is plausible where the plaintiff pleads factual content that would allow a court to draw the reasonable inference that defendant is liable for the misconduct alleged. *Ashcroft v. Iqbal*, 556 U.S. 662 (2009).

## LAW AND ARGUMENT

### I. Defendant LeBlanc must not be dismissed because counsel consented to service and because there exists specific personal jurisdiction over him.

**A. Counsel for LeBlanc agreed to waive service after dodging it.**

The Plaintiff does not dispute that Defendant LeBlanc was not formally served with this

-2-

Case 1:24-cv-00221-TDS-LPA   Document 12   Filed 07/05/24   Page 2 of 20

lawsuit. However, this was because the Sheriff for Norfolk County, Mass., where LeBlanc resides, attempted service, as evidenced by Exhibit A, and noted he was dodging service. Plaintiff therefore sought to waive service, which counsel implicitly granted. Defendant's representations by previous counsel smack of bad faith. Counsel for Plaintiff made clear that the extensions in this Action were conditioned upon Mr. Leerberg "waiving service as to any remaining defendants which have not yet been formally served." (Exhibit B). Counsel stated that he would "seek authorization . . . and revert to you promptly." Counsel for Plaintiff never received a response and Mr. Leerberg was fired shortly thereafter. Subsequent counsel did not even raise this issue or indicate a lack of consent until filing this motion. Accordingly, the Court should find either that Mr. LeBlanc, through counsel, has agreed to waive service of process or alternatively permit the Plaintiff additional time to formally serve Mr. LeBlanc.

### B. This Court has specific personal jurisdiction over Mr. LeBlanc.

There exist two types of personal jurisdiction: general and specific. Specific personal jurisdiction exists when the defendant has "purposefully directed his activities at residents of the forum and the litigation results from alleged injuries that arise out of or related to those activities." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472 (1985). General personal jurisdiction exists when the defendant's contacts with the forum, whether or not related to the litigation, are "continuous and systematic." *Helicopteros Nacionales de Colombia v. Hall*, 466 U.S. 408, 416 (1984). Plaintiff does not contest that this court lacks *general* jurisdiction over LeBlanc. However, this Court unquestionably has *specific* jurisdiction over LeBlanc.

A federal court may assert *specific* personal jurisdiction over a nonresident defendant when it commits "some act by which [it] purposefully avails itself of the privilege of conducting activities within the forum State." *Hanson v. Denckla*, 357 U.S. 235, 253 (1958). Furthermore,

the plaintiff's claims "must arise out of or relate to the" defendant's contacts with the forum. *Helicopteros*, 466 U.S. at 414. To demonstrate purposeful availment, the plaintiff need only show (1) that the defendant conducted some activity in the forum so as to subject it to personal jurisdiction there and (2) that the constitutional notions of fair play and substantial justice are satisfied such as to be consistent with due process requirements. *Burger King*, 471 U.S. 462, 464 (1985). This Court exercises personal jurisdiction over a nonresident defendant of the forum state to the maximum extent authorized by the law of the forum, usually as dictated by the state's long arm statute. FED R. CIV. P. 4(e), (k)(1).

The first subpart of demonstrating purposeful availment is satisfied here. The North Carolina long-arm statute reflects a purpose to assert jurisdiction over a nonresident defendant to the fullest extent permitted by the Due Process Clause of the Fourteenth Amendment. *Gen. Latex & Chem. Corp. (of N.C.) v. Phoenix Med. Tech., Inc.*, 765 F. Supp. 1246, 1250 (W.D.N.C. 1991). The North Carolina long-arm statute, N.C. GEN. STAT. § 1-75.4, provides several bases for the exercise of specific personal jurisdiction over Defendant LeBlanc. In relevant part, the conduct at issue here falls under Sections 2, 3, and 5 of the statute.

Sections 3 and 4 of the Long Arm statute address the exercise of personal jurisdiction "in any action claiming injury to person or property or for wrongful death within or without this State arising out of an act or omission within this State by the defendant" and "in any action for wrongful death occurring within this State or in any action claiming injury to person or property within this State arising out of an act or omission outside this State by the defendant, provided in addition that at or about the time of the injury either: solicitation or services activities were carried on within this State by or on behalf of the defendant." N.C. GEN. STAT. § 1-75.4(3), (4). Mr. LeBlanc's course of conduct, as well as the contingency fee agreement sent to the Plaintiff,

indicate that Mr. LeBlanc both committed both tortious injuries *in* North Carolina as well as committed actions from Massachusetts the resulted in local injury in North Carolina.

Start with the proposed fee agreement sent to Mr. Cunningham as a result of the illegal telemarketing conduct attached as Exhibit C. That proposed agreement was between Wallace & Graham, PA., Rhine Law Firm, P.C., and Sokolove Law, LLC on the one hand and Mr. Cunningham's alias he provided during the illegal calls, "Craig Smith," on the other. The agreement offered to represent Plaintiff "with regards to water contamination at Camp Lejeune, Jacksonville, Onslow County, North Carolina." The agreement also provided that 20% of the **unlawful** 33.33% fee would be paid to "Sokolove Law." Mr. LeBlanc is a partner at Sokolove Law. The agreement also stated North Carolina Law would apply to Mr. LeBlanc, including as "associated counsel" "in compliance with the North Carolina Rules of Professional Responsibility." Accordingly, Mr. LeBlanc has engaged in actions in North Carolina by his acts and omissions, including his association with the contract securing legal services.

Mr. LeBlanc has also conducted foreign acts which caused local injury within North Carolina. Specifically, as part of the course of conduct precipitated by the illegal calls, Mr. LeBlanc *personally* sent the Plaintiff multiple *signed* emails pressuring him to sign the aforementioned agreement. These emails are reproduced herein and attached as Exhibit D. In identical emails dated October 18 and November 3, Mr. LeBlanc stated that he and Wallace & Graham "are working together to represent individuals across the nation who have been injured by Camp Lejeune." Clearly, Camp Lejeune is in North Carolina. In another email on November 20, 2023, Mr. Leblanc states that he wanted to send "documents on behalf of our firm and Wallace & Graham to review, sign and return." Clearly, these emails, even if sent from Massachusetts, were sent for the purposes of "solicitation" of "services" to be "carried on within

North Carolina by or on behalf of the defendant," exactly as the long arm statute requires. N.C. GEN. STAT. § 1-75.4(4)(a).

The text of the agreement *itself*, which significantly was sent *as a result of the illegal telemarketing conduct complained of*, also supports the exercise of long-arm jurisdiction against Mr. LeBlanc under Section 5 of the North Carolina Long Arm Statute, which permits the exercise of personal jurisdiction in any action which "arises out of a promise . . . by the defendant to perform services within this State." N.C. GEN. STAT. § 1-75.4(5)(a). As the purposed agreement makes clear, the place for performance of the solicited services was to be in Onslow County, North Carolina as a result of the Camp Lejeune water contamination litigation pending in federal court there. The agreement was made with two other North Carolina law firms. Moreover, Mr. LeBlanc presumably has separate contracts with the other signatories to the proposed contingency fee agreement to provide services for the Plaintiff's benefit, as well as for the benefit of the co-defendants, therefore also satisfying the existence of local services and contracts under subsections (b) and (c) of the statute.

Nothing about the exercise of jurisdiction against Mr. LeBlanc here offends traditional notions of fair play and substantial justice, nor is inconsistent with constitutional due process. The crux of the constitutional "due process analysis" is "foreseeability," "the defendant's conduct and connection with the forum State are such that he should reasonably anticipate being haled into court there." *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980). The Due Process Clause gives a degree of predictability to the legal system that allows potential defendants to structure their primary conduct with some minimum assurance as to where that conduct will and will not render them liable to suit. *Id.* "When a corporation purposefully avails itself of the privilege of conducting activities within the forum State, it has clear notice that it is

-6-

Case 1:24-cv-00221-TDS-LPA   Document 12   Filed 07/05/24   Page 6 of 20

subject to suit there." *Id.* (cleaned up). There can be no doubt Mr. LeBlanc directed illegal marketing efforts into and affecting North Carolina, including by partnering with North Carolina law firms for Camp Lejeune water contamination litigation and by sending contracts which had everything to do with North Carolina. The Plaintiff's case arises out of that same conduct and illegal marketing practices seeking to solicit business for litigation to be filed in North Carolina. There is nothing unforeseeable about getting sued in North Carolina as a result.

Because at least three separate sections of North Carolina's long arm statute apply here, Mr. LeBlanc is unquestionably subject to *specific* personal jurisdiction in North Carolina arising out of such activity. To the extent that questions regarding jurisdiction remain, this Court should grant leave to conduct jurisdictional discovery, including discovery aimed at Mr. LeBlanc's involvement with the illegal telemarketing scheme at issue targeting North Carolina.

## II. Rule 12(b)(6) does not require dismissal of this textbook TCPA complaint.

### A. The TCPA imposes personal liability on the individual defendants.

The Individual Defendants' claim that the TCPA prohibits individual claims against them because the Plaintiff has sued their corporate entities is patently false as a legal matter. The TCPA is part of the Communications Act of 1934, as amended, and the Communications Act contains a *respondeat superior* provision. *See* 47 U.S.C. § 217 ("[T]he act, omission, or failure of any officer, agent, or other person acting for or employed by any common carrier or user, acting within the scope of his employment, shall in every case be also deemed to be the act, omission, or failure of such carrier or user *as well as that of the person*.") (emphasis added). This provision applies when "construing and enforcing the provisions of the Communications Act," including the TCPA. *Reynolds Corp. v. National Operator Services, Inc.*, 73 F. Supp. 2d 299, 305 (W.D.N.Y. 1999).

District Courts across the country have consistently invoked this provision to apply to employees and corporate officers who have direct, personal involvement in the illegal conduct at issue, and held that the "any person" language in § 217 applies to *all* persons, including corporate officers and employees. *See Williams v. Schanck*, No. 5:15-CV-01434-MHH, 2019 WL 4246570, at *4 (N.D. Ala. Sept. 6, 2019); *Maryland v. Universal Elections*, 787 F. Supp. 2d 408, 415-16 (D. Md. 2011); *Texas v. Am. Blast Fax, Inc.*, 164 F. Supp. 2d 892, 898 (W.D. Tex. 2001). Plaintiff's allegations mirror those in *Spurlark v. Dimension Serv. Corp.*, where the court imposed personal liability on an individual alleged to be "in charge of AAP's telemarketing and that he is personally liable for the acts alleged in the Complaint pursuant [sic] 47 U.S.C. § 217." No. 2:21-CV-3803, 2022 WL 2528098, at *5 (S.D. Ohio July 7, 2022).

Plaintiff has alleged *more* than what the *Spurlark* court already held was sufficient to impose personal liability under the TCPA at the pleadings stage. Defendants are not liable solely because they are corporate officers and/or are lawyers at the respective law firms. Critically, the moving Defendants fail to address that, as reproduced in the Complaint, they *actually signed* the proposed representation agreement that they sought to have the Plaintiff enter into as a result of the illegal telemarketing calls that they themselves are alleged to have directed. If personally signing an agreement is insufficient to impose personal liability under the TCPA, then nothing is. In addition, the Plaintiff alleged specific actions which the individual Defendants took, any one of which is sufficient to impose personal liability:

(a) Mr. LeBlanc masterminded the illegal telemarketing scheme to mass dial numbers throughout the United States to generate as many Camp Lejeune claimants as possible with minimal scrutiny;
(b) receiving the aforementioned illegal contingency fee agreement signed by individual Defendants Wallace, Graham, Wallace Williams, Doby, and Rhine;
(c) receiving emails from LeBlanc pressuring him to sign the illegal agreement;

(d) Defendant Mona Lisa Wallace refusing to investigate the allegations of illegal marketing conduct which she allegedly did not have records of and bragging about her "suing the crap out of" the federal government for $500 million;

(f) Defendant Rhine refusing to place the Plaintiff on an internal do not call list or providing a copy of an internal do not call policy;

(g) Defendant Rhine personally investigating and verifying compliance with his own marketing scheme; and

(h) (i) personally signing proposed retainer agreements; (ii) personally making contact with the Plaintiff; (iii) personally overseeing the corporate Defendants' marketing efforts; (iv) personally generating business from and personally supporting the telemarketing calls; (v) personally refusing to take responsibility and provide the Plaintiff a copy of their do not call policies and place the Plaintiff on their do not call lists as required by law; and (vi) taking responsibility for TCPA compliance and fielding TCPA-related complaints but then failing to take any action when presented with a complaint regarding the same

Compl. ¶ 32, 52, 55, 62–64, 68–69, 72 ECF No. 1

Direct personal liability under the TCPA also applies to omissions, as the plain text of § 217 makes clear. Plaintiff has alleged that Defendants Wallace and Rhine failed to investigate or comply with the TCPA. In *Montelongo v. My Fin. Solutions LLC*, the plaintiff sued a call centre employee who did not place the plaintiff on a do-not-call list and the employee's manager who was responsible for "receiving, maintaining, investigating and responding to complaints about TCPA violations." No. SA-19-CV-00577-JKP, 2020 WL 210814, at *3 (W.D. Tex. Jan. 14, 2020). The Plaintiff's allegations here mirror and in fact exceed the minimum level in *Montelongo* with respect to these Defendants' failure to investigate these serious telemarketing problems. Finally, in both *Spurlark* and *Montelongo*, the individual defendants, as Mr. LeBlanc here, raised personal jurisdiction challenges, both of which the respective courts rejected.

The case of *City Select Auto Sales, Inc. v. David Randall Associates, Inc.*, 885 F.3d 154, 159–62 (3d Cir. 2018), is distinguishable and does not warrant dismissal of Plaintiff's claims. All *City Select* stands for is the proposition that a plaintiff must allege that a corporate officer alleged to have personally violated the TCPA must also plead that that person either had direct, personal participation in the conduct alleged to have violated the TCPA or personally authorized it. *Id.* at

162. In other words, a plaintiff cannot succeed on a direct individual TCPA liability theory merely by alleging that a corporate officer oversaw illegal marketing conduct. Simply put, mere allegations of negligent or want of supervision (or, conversely, mere knowledge of TCPA-violative conduct), is not enough; a plaintiff must plead personal involvement and prove it up at trial. *City Select* found no personal liability after a jury trial on mixed evidence as to the defendant's personal involvement in the conduct alleged. That conclusion is nothing new, and it's exactly what Plaintiff does, just like in both *Spurlark* and *Montelongo.* The Third Circuit did not address or impose a standard as to the level of involvement required to trigger personal liability. To be sure, the Plaintiff will be required to prove the same, but his allegations here at the pleadings stage are sufficient.

**B. The Plaintiff pleads a textbook vicarious liability TCPA case as against Defendants Wallace & Graham and Rhine.**

Defendants' vicarious liability arguments can likewise be summarily disposed of. The Defendants here incredulously ignore the smoking gun evidence of the Defendants' direct, let alone vicarious, liability for the calls at issue. The Plaintiff not only has a proposed retainer agreement from the Defendants who now claim that they cannot be held directly or vicariously liable for the calls, but that agreement *is signed by representatives of the Defendants who now contest their liability.* The contention that there exists no direct liability, let alone an agency relationship, in a case where the Plaintiff possesses a *writing singed by the Defendants* as a result of the very illegal conduct alleged, borders on the frivolous, not to mention absurd. This is not to mention the fact that the writing charges an illegal fee of 33.33%, a fact which is doubtless of concern to the United States Department of Justice and Navy Inspector General.

Defendants Wallace & Graham and Rhine Law Firm claim that the Plaintiff pleads no facts that they were "involved in or even aware of the calls." (Br. at 11). To be clear, that

-10-

assertion means that these Defendants (allegedly) had no clue or any idea that their retainer agreement, binding them in contract, was being sent to putative plaintiffs conferring benefits of fees to all three Defendant law firms as a result of their calls. That begs the question: if signed, retainer agreements were not being sent out as a result of illegal telemarketing, then as a result of what, pray tell, were they being sent out as a result of? Martian abductions? Smoke signals? Discovery may well prove that the retainer agreements were instead sent out as of part of a campaign of drone advertising or any other theory. But for now, the Plaintiff plausibly alleges that the retainers were sent out as a result of illegal telemarketing, thus demonstrating Defendants' knowledge that such calls were being made. The Defendants' motion denies, with a straight face, no less, the obvious fact that the Defendants knew *full well* that their retainer agreements would be sent out as a result of the illegal telemarketing scheme alleged.

Faced with a nearly *identical* fact pattern with the *very Plaintiff here*, the Western District of Texas had no trouble rejecting the very argument advanced here and holding that evidence of a retainer agreement received as a result of a telemarketing call was sufficient to impose direct liability on all the law firms named in the agreement. *Cunningham v. Watts Guerra, LLP*, No. SA-22-CV-363-OLG (HJB), 2024 WL 3100773, at *13 (W.D. Tex. May 23, 2024).

A plaintiff is required to allege a sufficient basis for any "one of the common law agency theories." *Cunningham v. Cap. Advance Sols., LLC*, No. 17-13050 (FLW), 2018 U.S. Dist. LEXIS 197590, at *17-21 (D.N.J. Nov. 20, 2018) (same Plaintiff). "[A] plaintiff is not required to plead all of its evidence in the complaint in order to plausibly allege agency." *Dolemba v. Ill. Farmers Ins. Co.*, 213 F. Supp. 3d 988, 996 (N.D. Ill. 2016) (citing *Dish Network*). A plaintiff must only "allege a factual basis that gives rise to an inference of an agency relationship through the use of generalized as opposed to evidentiary facts." *Mauer v. Am. Intercontinental Univ.,*

-11-

*Inc.*, 2016 U.S. Dist. LEXIS 120451, at *2 (N.D. Ill. Sep. 7, 2016).

For TCPA claims specifically, there is a low bar to pleading liability, as a plaintiff is *not expected* to allege "facts suggesting that" the defendant: (1) "instructed" the putative agent "to make the call to" the plaintiff, (2) "had any authority over the time, means and manner of" the putative agent's solicitations, or (3) "had the ability to issue instructions … on these subjects." *Watts Guerra*, 2024 WL 3100773, at *13 ("Given Plaintiff's allegations that he was solicited by robocallers to file a Camp Lejeune claim… and in light of the documents Plaintiff received… Plaintiff's complaint and supporting information allows the Court to draw a reasonable inference of liability here. Defendants' argument that more specificity was required at this stage is untenable."); *Dolemba*, 213 F. Supp. 3d at 997.

Here, there exists textbook expressions of direct liability for the calls, or at the very least actual authority. The hallmark of actual authority is the ability of the agent to bind the principal in contract. *Harris v. Ray Johnson Const. Co.*, 534 S.E.2d 653, 655 (2000); *Themis Cap., LLC v. Democratic Republic of Congo*, 881 F. Supp. 2d 508, 522 (S.D.N.Y. 2012) Here, the Court can easily conclude that the callers, even if they were employed by Defendant Sokolove, are nevertheless the agents for the two other principal law firms because they evidently have the ability and authority to bind them in contract, and not just any contract, but a *joint* **unlawful** representation agreement for legal services obtained through the telemarketing calls complained of, which also happened to be illegal. Moreover, Sokolove continued to pressure the Plaintiff to sign the contract naming all three law firms. *Watts Guerra* teaches this is sufficient.

### C. The ATDS claims survive for at least twenty-five of the alleged calls.

The Defendants' attempts to dismiss the Plaintiff's ATDS claims were dead before they even hit this Court's docket. Tellingly, the Defendants do not dispute that the Plaintiff has

-12-

adequately pled the use of an ATDS with respect to at least the first call on October 2. (Br. at p. 12). The moving Defendants, however, fail to acknowledge that the Plaintiff pleads receiving twenty-four *additional* such calls from the *exact same* caller ID, 786-758-3380. (Compl. ¶ 36, 54). The Plaintiff has pled that this caller ID is "associated with a telephone provider named VoIP Innovations, a 'wholesale carrier services' telephone service offered by a company named Sangoma." (Compl. ¶ 73). Sangoma, in turn, markets VoIP Innovations for use with Asterisk, a popular brand of telephone software that has the computer code necessary to dial numbers out of the box randomly using the "rand" function. (Compl. ¶ 74, 75). Defendants can't explain why the Plaintiff's allegations with one call from a phone number sufficiently demonstrate ATDS use at the pleadings stage but why later calls from the same phone number, and same system, aren't.

The Plaintiff's allegations in this regard, by the Defendants' own admission, tracks what the statute requires: the allegation of "haphazard conduct" "that a caller is casting as wide a net as possible to contact as many people as he or she can." (Br. at p. 13). The Plaintiff alleges exactly that: he was randomly called "despite him never having been to Camp Lejeune or even serving in the US Marine Corps or Navy," lending credence to the claim that Plaintiff's telephone number was "randomly or sequentially generated and these calls were just being spammed out." (Compl. ¶ 39). Defendants do not deny that the Plaintiff has plausibly alleged that his number was randomly generated, at least for the first call. But they contend that because the Plaintiff investigated the caller, any subsequent calls to the Plaintiff's number could not have been randomly generated. That simply does not track.

The Defendants' argument not only requires the Court to make impermissible technical assumptions at the pleading stage but also doesn't track with the plain statutory text. First, the Defendants require this court to adopt unproven, technical assumptions and inferences about how

-13-

their telephone system operates. They *assume*, without support, that any phone system that calls a person back can track calls, is somehow also able to track the status of the agreement and other information, and does not rely on random telephone number generation for later calls. But most phone systems *don't* have that functionality. Indeed, it is equally likely, if not more so, that the Plaintiff's telephone number was continuously being randomly or sequentially generated "like clockwork" – as the Plaintiff alleges. It is only *after* that point, when the Plaintiff would have answered the call, that a human would have known that they spoke to him previously, such as by looking at the call history log. In fact, if the Defendants' phone system operated in this way, it is more likely that the Plaintiff would have received calls from different numbers, indicating the use of different systems having the ability to track calls and the Plaintiff's contact information, which he did, as opposed to the different, random system that sent twenty-five of the calls.

Second, the Defendants' argument is a red herring untethered from the plain text of the statute. The TCPA defines an ATDS as "equipment which has the capacity to store or produce telephone numbers to be called, using a random or sequential number generator; and to dial such numbers." 47 U.S.C. § 227(a)(1). The District of Columbia Circuit has held that "capacity" in the statute refers to the *present* capacity of the system to randomly generate telephone numbers. *ACA Int'l v. FCC*, 885 F.3d 687, 696 (D.C. Cir. 2018). The text plainly does not require a telephone number to be generated randomly every single time it is dialed; it also permits *storage* of randomly-generated telephone numbers. 47 U.S.C. § 227(a)(1). Defendants' reading renders the term "store" in "store or produce" superfluous and without meaning. The statute makes clear that if the equipment generates the telephone number randomly as an initial matter, at least once, and later stores it, it is still an ATDS that is illegal. The Defendants here concede that, at least for pleading purposes, the Plaintiff has plainly alleged that the equipment had, at the time of the first

call, the *present* capacity to randomly generate telephone numbers and did in fact generate the Plaintiff's telephone number randomly. Defendants fail to explain how the system somehow lost that capacity, i.e. changed its "current and unmodified state," in such a way that the Plaintiff merely providing his phone number would constitute an "upgrade or modification" to the telephone system not allowing it to store or produce the Plaintiff's randomly-generated number again. *Cf. id.* This theory makes little sense given that twenty-four other calls came from the same caller ID and system, supporting the inference that the same automated system was used. Plaintiff's telephone number was randomly generated at least once, and then either stored or generated on each subsequent call, exactly as required by the statute.

There remains little to be said on the ATDS point except for the Defendants' beef with a lack of specificity of what happened on each calls, which would be unwieldy and require excruciating detail of fact pleading not necessary in the Complaint. That provides little basis for granting the Defendants' motion. In any event, the Plaintiff should be permitted leave to amend if his pleadings are deemed to be insufficient in this regard. Ultimately, the Plaintiff has plausibly alleged ATDS use as to at least the twenty-five calls he received from the same system and caller ID and as the Defendants admit are sufficient for at least one call.

### D. The NCTSA unquestionably applies here; Plaintiff needn't be a resident of North Carolina to avail this law.

The plain text of the North Carolina Telephone Solicitation Act makes clear that it applies to both residents of North Carolina and nonresidents alike. In his third cause of action, the Plaintiff alleges seven violations of Section 102 of the NCTSA, subsections (b), (c)(1), (d), (e), (g), (i), and (j). The operative language in each of those sections relies on language defined in the previous section, including the definition of a "telephone solicitor." The statute defines a "telephone solicitor" as "Any individual, business establishment, business, or other legal entity

-15-

Case 1:24-cv-00221-TDS-LPA    Document 12    Filed 07/05/24    Page 15 of 20

*doing business in this State*". N.C. GEN. STAT. § 75-101(10) (emphasis added). "'Telephone solicitor' *also includes* any party defined as a 'telemarketer' under the Telemarketing Sales Rule." *Id.* This Court need not look to what constitutes "doing business in this state" because the statutory alternative proves Defendants are "telemarketers" under the "Telemarketing Sales Rule," thus obviating the requirement that they do "business in this State." The Defendants ignore that, in addition to the statutory definition of a "telephone solicitor," the definition *also* subjects to its reach "any party defined as a 'telemarketer' under the Telemarketing Sales Rule" rendering the jurisdictional question irrelevant. *Id.*

The Telemarketing Sales Rule, 16 C.F.R. § 310, defines a "telemarketer" as "any person who, in connection with telemarketing, initiates or receives telephone calls to or from a customer or donor." 16 C.F.R. § 310.2(gg). A "person" is "any individual. . . or other business entity." 16 C.F.R. § 310.2(y). "Telemarketing" is "a plan, program, or campaign which is conducted to induce the purchase of goods or services." 16 C.F.R. § 310.2(hh). A "customer" is "any person who is or may be required to pay for goods or services offered through telemarketing." 16 C.F.R. § 310.2(n). The Plaintiff has adequately alleged that Defendants are "telemarketers" under the Telemarketing Sales Rule. (Compl. ¶ 20, 65). The Defendants are all "persons." (Compl. ¶ 5–10). The calls were made to solicit the Plaintiff for legal services. (Compl. ¶ 35). And the Plaintiff is a customer because he was asked to pay for the legal services. (Compl. ¶ 52).

In any event, the term "doing business in this state" is a *jurisdictional hook*; it is not to be read narrowly as to require the recipient of every call be in North Carolina, particularly when the statute also defines the term "telephone subscriber" generally, and *not* the term "North Carolina telephone subscriber." In relevant part, the statute defines "telephone subscriber" as "an individual who subscribes to . . . a wireless telephone company." *Id.* N.C. GEN. STAT. § 75-

-16-

Case 1:24-cv-00221-TDS-LPA   Document 12   Filed 07/05/24   Page 16 of 20

*doing business in this State*". N.C. GEN. STAT. § 75-101(10) (emphasis added). "'Telephone solicitor' *also includes* any party defined as a 'telemarketer' under the Telemarketing Sales Rule." *Id.* This Court need not look to what constitutes "doing business in this state" because the statutory alternative proves Defendants are "telemarketers" under the "Telemarketing Sales Rule," thus obviating the requirement that they do "business in this State." The Defendants ignore that, in addition to the statutory definition of a "telephone solicitor," the definition *also* subjects to its reach "any party defined as a 'telemarketer' under the Telemarketing Sales Rule" rendering the jurisdictional question irrelevant. *Id.*

The Telemarketing Sales Rule, 16 C.F.R. § 310, defines a "telemarketer" as "any person who, in connection with telemarketing, initiates or receives telephone calls to or from a customer or donor." 16 C.F.R. § 310.2(gg). A "person" is "any individual. . . or other business entity." 16 C.F.R. § 310.2(y). "Telemarketing" is "a plan, program, or campaign which is conducted to induce the purchase of goods or services." 16 C.F.R. § 310.2(hh). A "customer" is "any person who is or may be required to pay for goods or services offered through telemarketing." 16 C.F.R. § 310.2(n). The Plaintiff has adequately alleged that Defendants are "telemarketers" under the Telemarketing Sales Rule. (Compl. ¶ 20, 65). The Defendants are all "persons." (Compl. ¶ 5–10). The calls were made to solicit the Plaintiff for legal services. (Compl. ¶ 35). And the Plaintiff is a customer because he was asked to pay for the legal services. (Compl. ¶ 52).

In any event, the term "doing business in this state" is a *jurisdictional hook*; it is not to be read narrowly as to require the recipient of every call be in North Carolina, particularly when the statute also defines the term "telephone subscriber" generally, and *not* the term "North Carolina telephone subscriber." In relevant part, the statute defines "telephone subscriber" as "an individual who subscribes to . . . a wireless telephone company." *Id.* N.C. GEN. STAT. § 75-

101(11). There is no requirement in the statutory text that a wireless "telephone subscriber" be a North Carolina resident or subscribe to wireless telephone service in North Carolina. There is likewise no requirement that the subscriber be subscribed to a *North Carolina* wireless telephone company or that the billing address for the number be in *North Carolina* as with landline or CLEC services. *Id.* The statute simply requires that the aggrieved party be a "telephone subscriber."

Defendants do not deny that they *also* call North Caolina telephone subscribers, nor can they. Two of the Defendant law firms are based in North Carolina and Defendant Sokolove also has an office in North Caolina. They therefore unquestionably make calls to North Carolina residents, thus "doing business in [North Carolina]" as required by N.C. GEN. STAT. § 75-101(4). So long as the Plaintiff has demonstrated that Defendants make calls to North Carolina telephone subscribers (even if he is not one), he has pled they "do business in the state" under the alternative requirement of being a "telephone solicitor" untethered to the Telemarketing Sales Rule. The Defendants ignore that their reading flatly contradicts the statutory definition of a "telephone subscriber" and nullifies it, in addition to failing to consider the two ways a consumer can prove a telemarketer is a "telephone solicitor" under the statute.

Defendants' second argument regarding allegedly insufficient pleading "automatic dialing and recorded message players" must likewise fail because the Plaintiff does *not even allege a violation of this provision*. The provisions and restrictions surrounding the use of such equipment is found in N.C. GEN. STAT. § 75-104. Plaintiff, however, does not plead violations of Section 104. He instead pleads violations of Section 102, pertaining to "Restrictions on telephone solicitations" generally. N.C. GEN. STAT. § 75-102. These include *any* telephone

-17-

Case 1:24-cv-00221-TDS-LPA   Document 12   Filed 07/05/24   Page 17 of 20

solicitation, a term, which as explained above, is *untethered* to the meaning or pleading of the use of such automatic equipment. N.C. GEN. STAT. § 75-101(9).

Defendants' third argument, that they cannot be vicariously liable for the conduct under state law, fails for the same reasons as their attempts to toss the federal law claims under a nearly identical theory. As an initial matter, the Plaintiff alleges *direct*, not vicarious liability, for the calls at issue. But even if this Court were to dive into a vicarious liability analysis under state law, which it need not do, the Defendants' argument fails because the Plaintiff was *sent an illegal signed proposed contract* with the Defendants' names on them. (Compl. ¶ 52). As explained above, the ability to bind the principal in contract is the quintessential hallmark of control because it is the hallmark expression of actual authority. The argument has already been rejected by the Western District of Texas in *Watts*-Gerra. The ability to contract is more than sufficient to demonstrate agency on behalf of the caller(s) and the Defendant law firms.

The Defendants' "double recovery" argument, which rests on the faulty assertion that the Plaintiff pleads violations of N.C. GEN. STAT. § 75-104, fares no better for the same reasons. As an initial matter, Plaintiff does not seek the same damages for automated equipment under Section 104 of the NCTSA as under Count 1 of his TCPA claim, and therefore the recovery is not duplicative. Regardless, the federal claims and state claims do not seek identical relief under identical theories. The federal claims rest on violations of *federal law* with statutory damages, and the state claims rest on violations of *state law* providing alternative avenues for recovery with separate statutory damages and are therefore not duplicative.

The Plaintiff's state law claims also require proving different sets of fact and different violative conduct than the federal claims. Most concerningly, the Defendants' contention borders on the frivolous because the Fourth Circuit has rejected the exact same argument here and

-18-

Case 1:24-cv-00221-TDS-LPA   Document 12   Filed 07/05/24   Page 18 of 20

concluded that this overlap does not constitute double recovery because the TCPA and state telemarketing law "penalize different violative conduct." *Mey v. Phillips*, 71 F.4th 203, 224 (4th Cir. 2023); *Guadian v. Progressive Debt Relief, LLC*, No. EP-23-CV-00235-FM, 2023 WL 7393129, at *4 (W.D. Tex. Nov. 8, 2023) (holding that factual overlap between TCPA and state causes of action did not constitute double recovery); *see also New York v. Ametek, Inc.*, 473 F. Supp. 2d 432, 434 (S.D.N.Y. 2007).

## CONCLUSION

The Defendants' motion to dismiss throws a hodgepodge of weak-sauce arguments against the wall in the hopes that at least some will stick. While they may appear appetizing as an initial matter on a first glance, an analysis of each of the arguments show they are tenuous and under-developed because they run contrary to multiple instances of well-established case law and principles of statutory construction. The motion must be denied in its entirety. The Defendants will and should be free to examine the agency and ATDS arguments at jury trial.

Dated: July 5, 2024

        Respectfully submitted,

        By: *s/ Andrew Roman Perrong*
        Andrew Roman Perrong
        PA. Attorney I.D. #333687
        Perrong Law LLC
        2657 Mount Carmel Avenue
        Glenside, PA 19038
        Tel: (215) 225-5529
        Fax: (888) 329-0305
        a@perronglaw.com

By: *s/ Ryan P. Duffy*
Ryan P. Duffy
N.C. Attorney I.D. #55904
The Law Office of Ryan P. Duffy, PLLC
1213 W. Morehead Street
Suite 500, Unit 450
Charlotte, NC 28208
Tel: (704) 741-9399
ryan@ryanpduffy.com

*Attorneys for Plaintiff*

# CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on July 5, 2024, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF, which is being served this day on all counsel of record via transmission of Notice of Electronic Filing generated by CM/ECF.

By: *s/ Andrew Roman Perrong*
Andrew Roman Perrong

# CERTIFICATE OF WORD COUNT

I HEREBY CERTIFY that this brief complies with the word count limitations set forth pursuant to M.D.N.C. Rule 7.3(d)(1). The word count does not exceed 6,250 words, including the body of the brief, headings, and footnotes.

July 5, 2024

By: *s/ Andrew Roman Perrong*
Andrew Roman Perrong